IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIEP HOANG NGUYEN, | No. CIV S-06-2329-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 24) and defendant's cross-motion for summary judgment (Doc. 26).

/ / /

/ / /

/ / /

/ / /

# I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on January 13, 2003.[1] In his application, plaintiff claims that disability began on August 13, 2001.[2] Plaintiff claims his disability consists of "severe depression, anxiety, lack of concentration." Plaintiff is a United States citizen born in Vietnam on August 27, 1978, with a high school education and some college courses. Plaintiff's claim was initially denied. Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on May 12, 2004, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres.

In his July 2, 2004, decision, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on August 13, 2001, the date the claimant states he became unable to work, and continued to meet them through December 31, 2003;

2. The claimant has not engaged in substantial gainful activity since [August 13, 2001];

3. The medical evidence establishes that the claimant has severe depression, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4; the claimant does not have a severe medical impairment that would even slightly limited his ability to perform exertions;

4. The claimant's testimony is not substantially credible for the reasons stated in the body of this decision;

5. The claimant has the residual functional capacity to perform the non-exertional requirements of work except for performing work tasks in excess of a simple, routine, unskilled nature and working in high stress environments; there are no exertional limitations;

---

[1] Plaintiff first filed for benefits on August 24, 2001. On November 5, 2001, the agency determined that plaintiff was disabled due to schizophrenic, paranoid, and other functional disorders. However, on December 7, 2001, plaintiff was informed that he was not entitled to benefits due to his excess resources. Plaintiff never sought reconsideration of this determination. By order issued on June 21, 2007, this court granted defendant's motion to dismiss this action insofar as it may relate to the December 2001 denial of benefits. This action is limited to consideration of denial of benefits following plaintiff's January 2003 application.

[2] In an adult disability report dated January 13, 2003, plaintiff stated he stopped working in June 2000.

| | | |
|---|---|---|
| | 6. | The claimant is able to perform his past relevant work as a caregiver to the elderly/disabled; |
| | 7. | The claimant is 25 years old, which is defined as a younger individual; |
| | 8. | The claimant possesses a high school education; |
| | 9. | The claimant does not have any acquired skills which are transferable to the skilled or semi-skilled work functions of other work; |
| | 10. | If the claimant's non-exertional limitations did not significantly compromise his ability to perform work at all exertional levels, section 204.00, Appendix 2, Subpart P, Regulations No. 4 indicates that a finding of not disabled would be appropriate; if [his] capacity to work at all levels were significantly compromised, the remaining work which he would functionally be capable of performing would be considered in combination with his age, education, and work experience to determine whether a work adjustment could be made; |
| | 11. | Considering the range of work at all exertional levels which the claimant is still functionally capable of performing, in combination with his age, education, and work experience, and using the above-cited section 204.00 as a framework for decision-making, the claimant is not disabled; and |
| | 12. | The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. |

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits. After the Appeals Council declined review on August 24, 2006, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following medical evidence concerning plaintiff's mental problems: (1) medical data dated February 12, 2002, from Sierra College Mental Health (CAR 106-09); (2) medical chart dated May 19, 2002, from Sutter Roseville Medical Center (CAR 110-12); (3) medical records dated March 22, 2001, through January 24, 2003, from Human Resources Consultants (CAR 114-31); (4) medical records dated January 6, 2003, through March 7, 2003, from Sacramento County Mental Health (CAR 133-45); (5) psychiatric evaluation dated May 14, 2003, by examining psychiatrist Michael

Joyce, M.D. (CAR 146-51); (6) mental residual functional capacity assessment and psychiatric review technique form dated June 24, 2003 (CAR 173-90); (7) psychiatric review technique form dated August 27, 2003 (CAR 152-65); (8) medical report dated December 8, 2003, by treating psychiatrist Arthur T. Giese, M.D. (CAR 207); (9) medical records dated October 13, 2003, through January 24, 2004, from Human Resources Consultants (CAR 208-23); and (10) medical report dated May 24, 2004, from Arthur T. Giese, M.D. (CAR 224).

<u>2001</u>

A document dated March 22, 2001, from Human Resources Consultants indicates that plaintiff said he had been sentenced for ten days in jail for violating a restraining order and that he "claims [he is] forced to be Catholic by sponsor." The physician[3] indicated that plaintiff was "very obsessive & delusional" and he "wondered about schizophrenia." Plaintiff was started on Risperdal at 1mg doses.

Chart notes from Sacramento County Mental health dated March 29, 2001, are largely undecipherable, but do indicate that plaintiff was "still delusional" and that his Global Assessment of Functioning ("GAF") was 45 (out of 100).

On May 1, 2001, plaintiff complained to a physician at Human Resources Consultants that his optometrist was "clouding my mind" and felt that the optometrist was engaged in a conspiracy and having "people following me." The physician assigned a GAF of 42 and indicated that plaintiff rarely complied with medications. By July 5, 2001, plaintiff indicated that his optometrist was ". . . not bothering me as much" but that he still felt "like he is being manipulated." His dosage of Risperdal was increased from 1mg to 2mg. The doctor assigned a GAF of 40. Notes from July 26, 2001, indicate some dosage alteration of plaintiff's medications and a GAF of 40. At this time, plaintiff was started on Effexor XR. By October 30, 2001, plaintiff indicated that Risperdal had helped his thinking improve. However, the doctor at

---

[3] Apparently, treating physician Dr. Giese, who is a psychiatrist with Human Resources Consultants.

4

1  Human Resources Consultants indicated that plaintiff rarely took his medications. He also
2  indicated that plaintiff was paranoid and assigned a GAF of 40.

<u>2002</u>

Treatment notes from Human Resources Consultants dated February 11, 2002, describe plaintiff as a 23-year-old male who "casually impresses as a female; long hair, effeminate mannerisms." The notes state that plaintiff had been having obsessive preoccupations. The notes, however, indicate that plaintiff's condition had improved. Specifically, the doctor noted that plaintiff was not delusional, that he was alert and oriented, and that his mood was neutral.[4] The doctor started plaintiff on Buspar and discontinued Effexor and Risperdal.

Treatment notes from Sierra College Mental Health dated February 12, 2002, indicate that plaintiff complained of increasing dizziness "for 1 year." Plaintiff also complained of "many stressors" including a car-jacking, robbery, and personal problems. Plaintiff was referred to a psychiatrist at Sacramento County Mental Health.

On May 19, 2002, plaintiff was seen at Sutter Roseville Medical Center with a chief complaint of dizziness. This visit does not appear to have revealed any objective findings related to mental problems. In particular, the doctor indicated "dizziness" as the impression, but did not indicate any findings supporting this impression or give any causes for the problem.

On May 20, 2002, plaintiff was seen again at Human Resources Consultants. Treatment notes from this visit indicate that plaintiff had complained of dizziness for several weeks. At this time, plaintiff had no other symptoms. The doctor stated that plaintiff "resists identification [with] gay groups."

///

---

[4] While the agency determined that plaintiff was disabled in 2001 due to schizophrenic, paranoid, and other functional disorders, these records indicate that plaintiff's condition had improved significantly by 2002.

5

<u>2003</u>

Treatment notes from Human Resources Consultants dated January 6, 2003, indicate that plaintiff complained at this time of low energy. Plaintiff was prescribed Wellbutrin SR. His GAF remained 40. In addition, plaintiff was diagnosed with new onset diabetes melitus. and given appropriate medication.[5] Notes from January 24, 2003, indicate that plaintiff's goals were to find the right combination of medication and to get back to school within the next 12 months.

Plaintiff was seen again at Sacramento County Mental Health in January 2003. At this time, he reported dizziness for the last three years and told the physician that he had been informed that a cause could not be determined. Notes of clinical observations at this time are cryptic at best. Treatment notes from February 25, 2003, indicate that plaintiff's blood glucose was under control. At this time, plaintiff still reported depression and stated that he had been seeing a private psychiatrist. While plaintiff indicated that depression was his main issue, he rejected an offer of county mental health services.

On May 14, 2003, psychiatrist Michael Joyce, M.D., performed a comprehensive psychological examination of plaintiff. For his chief complaint, plaintiff reported: "My past . . . being gay . . . I was often harassed, mostly verbally." Regarding the past issue with plaintiff's optometrist, Dr. Joyce indicated:

> The claimant know [sic] longer sees this episode as an issue and I get the distinct impression that he actually may have had romantic feelings towards the optometrist, but when they were not fulfilled, he developed a sort of a delusional response, maybe to save face.

Dr. Joyce also reported a gambling addiction, stating that plaintiff has an estimated $15,000.00 gambling debt at Cache Creek Casino. At the time of Dr. Joyce's examination, plaintiff did not

---

[5] Given the improvement in his mental state as of 2002, it appears that plaintiff's new complaints of dizziness and fatigue are related to the onset of diabetes and not continuing severe mental impairments.

report any delusional thinking, anxiety, or psychotic problems.  As to depression, Dr. Joyce stated that what this really refers to are complaints of low energy.  Based on his objective findings, Dr. Joyce assigned a GAF of "70 or above" and provided the following summary:

> In summary, this claimant appears currently capable of responding appropriately to supervision, coworkers, or the usual work situation including changes in a routine setting.

The court notes that, as to diabetes, Dr. Joyce reported that plaintiff "[d]enied diabetes melitus. . . says his doctor has ruled it out."

The record contains a mental residual functional capacity assessment dated June 24, 2003, completed by an agency physician.  The doctor noted that plaintiff was moderately limited in his ability to interact appropriately with the public, accept instructions and respond to criticism, get along with co-workers, maintain socially acceptable behavior, and respond to changes in the work setting.  The doctor noted no other significant limitations.

The record also contains a psychiatric review technique form dated August 27, 2003, completed by an agency physician.  The form notes no restrictions on activities of daily living, and only mild limitations in ability maintaining social functioning, concentration, persistence, and pace.

On November 17, 2003, treating psychiatrist Arthur Giese, M.D., completed a psychiatric intake note in which he stated:

> On interview patient is again very circumstantial, a difficult historian, displays no hallucinations, delusional ideas, or suicidality at present. Intelligence is high average.  He is somewhat insightful.  Motivation is positive.

On December 8, 2003, Dr. Giese completed a physician's statement.  His diagnosis was "psychosis NOS," which began in 1999.  Without noting any objective findings, Dr. Giese indicated that plaintiff's mental problems prevented him from performing any work. Even though Dr. Giese indicated that plaintiff could not perform any work activities as a result of his mental problems, Dr. Giese stated that plaintiff could care for himself at home.

7

<u>2004</u>

On January 5, 2004, Dr. Giese wrote a letter stating:

> He is here as a walk-in. He wants to know if we can treat him for chronic fatigue syndrome. He feels chronically ill and deteriorating, has had all sorts of medical workups, and nobody knows what is wrong with him. He also wants to know about the Oregon law, because he has diabetes and does not want any interference in voluntary euthanasia if he becomes so ill from it that his life is unbearable.
>
> He didn't take the medication for more than a week because it didn't seem to be giving him more energy. He remarks that he rarely follows prescription exactly, he does what he feels best doing. He does not need a prescription now.

It is unclear to whom this letter was sent.[6]

On January 26, 2004, Dr. Giese wrote another letter in which he stated:

> 25 year old single male with diagnosis of psychosis NOS . . . . He says he has a gambling problem and also identifies as homosexual. Symptomatically he has a good deal of depression. He says he began gambling at age 18 and has lost the best part of the intervening years. He used to use the Indian casino or the casinos in Tahoe and Reno.

Again, the record does not reflect to whom this letter was sent. There were no objective observations accompanying this letter.

A May 17, 2004, treatment note from Human Resources Consultants indicates: "doubtful if he is taking any meds!"

In May 2004, Dr. Giese wrote a letter to the Social Security Administration Office of Hearings and Appeals stating:

> The above-referenced man has been seen by me since March of 2001. He has a longstanding psychiatric disorder, presently diagnosed as Psychosis NOS . . . . He is also suffering from non-insulin dependent diabetes melitus. From the time I first saw him to the present, I consider him incapable of engaging in fulltime competitive mainstream employment.

---

[6] It should also be noted that, while Dr. Giese references chronic fatigue syndrome and diabetes, plaintiff did not complain of either of these problems in his application for benefits. Rather, plaintiff's claim is based on depression, anxiety, and lack of concentration.

As with Dr. Giese's other letters, this letter does not refer to any objective findings.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

/ / /
/ / /
/ / /
/ / /
/ / /

# IV.  DISCUSSION

In his motion for summary judgment, plaintiff raises the following five issues: (1) whether the ALJ failed to resolve inconsistencies in the evidence by fully developing the record; (2) whether the ALJ improperly rejected his treating physician's opinion; (3) whether the ALJ erred with respect to evaluation of plaintiff's mental impairment; (4) whether the ALJ failed to provide specific findings or analysis, as required by Social Security Ruling 82-62, in support of the conclusion that plaintiff could return to his past relevant work; and (5) whether the ALJ erred by failing to obtain testimony from a vocational expert given the finding that plaintiff was limited to a low-stress job.

### A.  Duty to Develop the Record

The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty.  See id.  The ALJ may discharge the duty by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

Plaintiff's argument concerning development of the record relates to plaintiff's diabetes.  Specifically, plaintiff argues:

> In his decision, the ALJ noted that the record does not contain evidence of "regular medical treatment, use of insulin, emergency hospitalization visits, end organ damage, or significant objective clinical findings due to diabetes."  (Tr. 17).  Indeed he concluded there were "no objective clinical findings whatsoever in the record that the claimant's ability to perform exertions would be even minimally compromised by diabetes melitus.  Hence this is deemed to be of a nonsevere nature."

> The ALJ never ordered or sought out those records.  Mr. Nguyen's hearing was in May 2004.  The latest records in the file were ordered in August 2003.[7]  Mr. Nguyen was not represented and did not know what was in and was not in the file.  The ALJ never informed him that the record was incomplete.  Before making negative findings contrary to the plaintiff's interest, the ALJ had a duty to obtain the information. . . .

In response, defendant argues that the duty to develop the record was not triggered because the ALJ did not note inadequate information or ambiguity.  Defendant states:

> Here, the record regarding Plaintiff's diabetes was neither ambiguous, nor inadequate, and the ALJ did not note any lack of information or ambiguity in the record. . . . [T]he medical evidence indicates that Plaintiff's diabetes was under control with medication as long as Plaintiff was compliant.  (See Tr. 141, 147, 211).  Plaintiff's treating physician noted that Plaintiff['s] diabetes was under control with medication.  (Tr. 211).  The ALJ was entitled to infer from [the] lack of objective findings that his diabetes was not sufficiently severe to significantly limit his ability to perform his past relevant work.  See Flaten v. Secretary of HHS, 44 F.3d 1453, 1464 (9th Cir. 1995).

As stated above, the ALJ's duty to develop the record, which is heightened when the claimant is not represented by counsel, is triggered only when the record is ambiguous or inadequate to make a determination.  See Cox, 587 F.2d at 991.  In this case, the record was neither ambiguous nor inadequate.  To the contrary, it is clear that plaintiff's diabetes is not a disabling condition.  In particular, and as the ALJ stated, the record was devoid of any clinical findings suggesting that plaintiff's diabetes is disabling.  In contrast to the lack of evidence that diabetes is disabling, treatment notes from February 25, 2003, indicate that plaintiff's blood glucose was under control.  And, in May 2003, when plaintiff was examined by Dr. Joyce, plaintiff denied diabetes, telling Dr. Joyce that his "doctor has ruled it out."  The court concludes that the lack of evidence does not indicate ambiguity or inadequacy such as would trigger the ALJ's duty to develop the record as to diabetes.

///

---

[7]  Even so, the court notes that the CAR contains records through May 2004.

**B.     Evaluation of Medical Opinions**

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff argues that the ALJ's "reasons for rejecting the treating physician's opinion are not supported by substantial evidence of the record." Specifically, he contends that: (1) the assessments from the consultative examiner and the non-examining physicians were not based on a review of the entire record; (2) the ALJ failed to take into consideration the side effects of medication plaintiff was taking; (3) the treating physician's opinion was based on his examination of plaintiff, not subjective complaints alone; and (4) the ALJ erred in concluding that plaintiff's daily activities undermined the credibility of the treating physician's opinion as to limitations. Plaintiff challenges the ALJ's rejection of Dr. Giese's May 2004 letter. As to Dr. Giese, the ALJ stated:

> The record also contains a May 2004 letter from sometimes treating psychiatrist Dr. Arthur Giese, M.D., which opined that the claimant's psychosis and personality disorder precluded him from working. However, the undersigned finds that this conclusory one paragraph assessment lacks credibility as: (1) it is at odds with the assessments from both the consultative psychiatrist and the two non-examining state agency psychiatrists; (2) it is inconsistent with the claimant's lack of use of anti-depressant medications; (3) it appears to have been based primarily upon the claimant's self-serving subjective statements; (4) the doctor previously conceded in November 2003 that he only "intermittently" treated the claimant and had not even seen him since 2002; (5) it does not take into consideration the claimant's history of medication noncompliance and improvement during those periods when he decided to take his medications; and (6) it is inconsistent with the claimant's wide ranging daily living activities. As such, it is concluded that Dr. Giese's work assessment is not credible.

Treating physician opinions are generally entitled to significant weight. However, where the treating physician's opinion is contradicted, the ALJ need only provide specific and legitimate reasons supported by the record for rejecting it. See Lester, 81 F.3d at 830. Based on the court's review of plaintiff's medical records, it is clear that Dr. Giese's opinion is contradicted. In particular, while Dr. Giese opined that plaintiff was unable to perform any work

due to mental problems, examining agency psychiatrist Dr. Joyce reached the opposite conclusion following his May 14, 2003, evaluation of plaintiff.  Furthermore, the court finds that the reasons given by the ALJ for rejecting Dr. Giese's contradicted opinion are specific and legitimate.   See e.g. Meanel, 172 F.3d at 1113 (holding that court may reject conclusory unsupported opinion).

The question, then, is whether the ALJ's conclusion as to Dr. Giese is supported by the record as a whole.  The court finds that it is.  Dr. Joyce performed a detailed psychiatric evaluation of plaintiff and noted that, at the time of his examination, plaintiff did not report any delusional thinking, anxiety, or psychotic problems.  As to depression, Dr. Joyce stated that what this really refers to are complaints of low energy.  Dr. Joyce's report references objective findings based on a number of tests.  For example, Dr. Joyce reported that plaintiff "[r]equires one trial to learn 4/4 new skills."  He also performed a recall test, a calculations test, an abstractions test, and an attention test, among others.  Based on his evaluation, Dr. Joyce concluded that there was "[n]o evidence for a primary mood, thought, or anxiety disorder. . ." and assigned plaintiff a GAF of 70 – well within the functional range – and concluded that plaintiff was not limited in any way due to mental problems.  Dr. Joyce's opinion alone constitutes sufficient evidence in the record to support the ALJ's rejection of Dr. Giese's opinion.

There is, however, additional evidence supporting the ALJ's analysis.  While plaintiff had complained of mental problems in 2001, the February 11, 2002, treatment notes from Human Resources Consultants – where Dr. Giese treated plaintiff – indicate that plaintiff's condition had improved.  Specifically, the doctor noted that plaintiff was not delusional, that he was alert and oriented, and that his mood was neutral.  In May 2002, plaintiff was seen again at Human Resources Consultants.  At this time, plaintiff had no symptoms other than dizziness.  In February 2003, even though plaintiff still complained of depression, he rejected an offer of county mental health services.  A psychiatric review technique form dated August 27, 2003, completed by an agency physician notes no restrictions on activities of daily living, and only mild

---

limitations in ability maintaining social functioning, concentration, persistence, and pace. Moreover, as the ALJ noted, Dr. Giese himself stated on November 17, 2003, that plaintiff "displays no hallucinations, delusional ideas, or suicidality at present" and that his "[i]ntelligence is high average," "[h]e is somewhat insightful," and "[m]otivation is positive." These observations by Dr. Giese are inconsistent with an inability to perform any work activity.

Contrary to plaintiff's assertion, the court finds that Dr. Giese's opinion is indeed minimally supported, if at all, as the ALJ indicated. It is also inconsistent with the record and Dr. Giese's own findings on other occasions. Despite the "timeline" of Dr. Giese's treatment, outlined in his motion for summary judgment, the court cannot find any evidence of clinical objective observations made by Dr. Giese, let alone any which support his opinion that plaintiff cannot perform any work. The court does not agree with plaintiff that spending time with the plaintiff and prescribing medications necessarily indicates that Dr. Giese made objective findings.

Turning to some of the specific portions of the record cited by plaintiff, the March 22, 2001, "annual assessment" is a listing of plaintiff's complaints and does not reference any particular objective findings. The same is true for the March 29, 2001, July 5, 2001, July 26, 2001, and October 30, 2001, progress reports. As with the March 22, 2001, "annual assessment," the "annual medication service plan" dated February 11, 2002, is also devoid of objective findings to support the doctor's assessment. Dr. Giese's January 5, 2004, and January 26, 2004, progress reports do not reference any objective findings but appear to be based solely on plaintiff's subjective complaints. In sum, the court cannot find the kinds of objective findings, such as those noted by Dr. Joyce, which would support Dr. Giese's conclusions.

### C.     Evaluation of Mental Impairment

In determining residual functional capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual

functional capacity reflects current "physical and mental capabilities"). Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow a special procedure. See 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The ALJ is required to record pertinent findings and rate the degree of functional loss. See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

Plaintiff argues that the ALJ erred by not following the special procedures outlined in the regulations in discussing plaintiff's mental problem. The court agrees with defendant, however, that any error in omission was harmless. The Ninth Circuit has applied harmless error analysis in social security cases in a number of contexts. For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056; see also Robbins v. Social Security Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056). Similarly, in Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the ALJ's failure to properly credit the claimant's testimony. The court held:

> However, in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied there was substantial evidence supporting the ALJ's decision. Any error the ALJ may have committed in assuming that Batson was sitting while watching television, to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.

Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education.

As defendant notes, the procedure outlined in the regulations for evaluating mental problems is designed to assist the ALJ in determining whether a mental impairment is severe enough to meet or medically equal an impairment listed in the regulations. In this case,

based on the conclusions reached by Dr. Joyce, the court finds that, even had the procedure been strictly followed, no reasonable ALJ would have reached a different disability determination with respect to plaintiff's mental problems. For this court to remand to require the ALJ to follow the procedures for evaluating the severity of plaintiff's mental impairment would be an exercise in futility.

### D. Past Relevant Work

Plaintiff's argument, in its entirety, is as follows:

> According to SSR 82-62 "past work experience must be considered carefully to assure that [t]he available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." SSR 82-62 further provides:
>
>> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.
>
> Pursuant to SSR 82-62, in finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the past job/occupation; and (3) a finding of fact that the individual's RFC would permit a return to his past job or occupation.
>
> In his decision, the ALJ gave a two sentence paragraph that Mr. Nguyen could do his past job as a caregiver. He made absolutely no findings of fact as to the mental or physical demands of that job and there was no assessment given Mr. Nguyen's severe depression, as to whether or not he could perform this job.

The court rejects plaintiff's argument. While the ALJ's analysis is indeed brief, it is sufficient. Specifically, the ALJ concluded in his decision that plaintiff has the residual functional capacity "to perform work in all exertional categories." The ALJ also found that plaintiff's mental impairment did not erode his functional capacity, except with respect to high-stress jobs. This satisfies the requirement that the ALJ make a specific finding as to residual functional capacity. Given that the ability to perform work in all exertional categories necessarily encompasses

plaintiff's past relevant work as a caregiver, and because this work does not involve high levels of stress, the ALJ also made the remaining two findings of fact. In particular, the ALJ stated that "[t]he claimant's past relevant work experience as a caregiver . . . involved the performance of exertional and nonexertional activities that were well within the claimant's residual functional capacity."

### E. Vocational Expert Testimony

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity. The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity. See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations. See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983). Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on strength factors only. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(d), (e)). The Commissioner may, however, rely on the Grids even when a claimant has combined exertional and non-exertional limitations, if non-exertional limitations do not impact the claimant's exertional capabilities.[8] See Bates v. Sullivan, 894 F.2d

---

[8] Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to

1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Here, the ALJ assumed for the sake of argument that plaintiff could not perform his past relevant work and considered whether he nonetheless could perform other work. Plaintiff argues that the ALJ's analysis on this question was flawed because he failed to take into account the limitation to low-stress jobs. According to plaintiff, vocational expert testimony was required on this point. Plaintiff's argument, in its entirety, is as follows:

> The ALJ found that assuming Mr. Nguyen could not do his past relevant work, he had the RFC for performing work tasks except in excess of simple routine unskilled nature and working in high stress environments. (Tr. 18). SSR 85-15 recognizes that "the mentally impaired may have difficulty meeting the requirement of even so-called low stress jobs." Assuming that the ALJ was correct and there was no exertional limitations, the ALJ should have considered how much the occupational base – the entire exertional span from sedentary work

---

perform sedentary, light, medium, heavy, or very heavy work. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a). "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. See 20 C.F.R. §§ 404.1567(a) and 416.967(a). "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. See 20 C.F.R. §§ 404.1567(b) and 416.967(b). "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 C.F.R. §§ 404.1567(c) and 416.967(c). "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. See 20 C.F.R. §§ 404.1567(d) and 416.967(d). "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. See 20 C.F.R. §§ 404.1567(e) and 416.967(e).

Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities. See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

through heavy (or very heavy) work – is reduced by the effects of the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s). SSR 85-15 indicates that in cases like this an adjudicator will need to consult a vocational resource. The ALJ failed to do so.

The court rejects plaintiff's argument for two reasons. First, the court finds that the ALJ's analysis as to plaintiff's ability to perform his past relevant work was correct. Therefore, there was no need for the ALJ to consider whether plaintiff could perform other jobs and any error in this analysis is necessarily harmless. Second, even if the ALJ were required to consider plaintiff's ability to perform other work, he correctly applied the Grids because any non-exertional limitations do not impact plaintiff's exertional capability of sitting, standing, walking, lifting, carrying, pushing, or pulling. Therefore, vocational expert testimony was not required in this case.

## V. CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment is denied;

    2.    Defendant's cross-motion for summary judgment is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED: March 27, 2008

                                                                         
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE